## CROSSMAN *v.* LURMAN.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 117. Argued December 18, 1903.—Decided January 11, 1904.

Chapter 661, § 41, 1893, of the Laws of New York, prohibiting the sale of adulterated food and drugs is not repugnant to the commerce clause of the Federal Constitution but is a valid exercise of the police power of the State.

A contract made in New York, for the sale of goods to be delivered and stored in New York on arrival from a foreign port is a New York contract governed by the laws of New York even though the buyers be residents of another State.

The Act of Congress of August 30, 1890, 26 Stat. 414, prohibiting importation into the United States of adulterated and unwholesome food is not such an action of Congress on the subject as deprives the States of their police power to legislate for the prevention of the sale of articles of food so adulterated as to come within valid prohibitions of their statutes.

The fact that a demand exists for articles of food so adulterated by fraud and deception as to come within the prohibitions of a state statute does not bring the right to deal therein under the commerce clause of the Constitution so that such dealings cannot be controlled by the State in the valid exercise of its police power.

A purchaser cannot be compelled to accept or to pay damages for non-acceptance of an article of food so adulterated as to come within the provisions of a state statute prohibiting the sale thereof because notwithstanding the adulteration it is equal in grade to a standard specified in the contract.

THE facts are stated in the opinion.

*Mr. Frederic R. Kellogg,* with whom *Mr. Arthur J. Baldwin* was on the brief, for plaintiffs in error:

The state statute so far as it is sought to affect a contract between citizens of the State of New York, as sellers, and citizens of another State, as buyers, and relating to goods which at the time of the contract were located in a foreign country, and which pursuant to the contract were to be imported into the United States, is unconstitutional as an interference with foreign and interstate commerce, and cannot be defended as an exercise of the police power of the State of New York. *Plumley* v. *Massachusetts* has no application to this case.

The universally recognized basis of the police power of a State is the right to protect the health, morals, safety and property of *its* citizens. *License cases,* 5 How. 504; *Sherlock* v. *Alling,* 93 U. S. 103; *Robbins* v. *Taxing District,* 120 U. S. 489; *Smith* v. *Alabama,* 124 U. S. 476; *Bowman* v. *R. R.,* 125 U. S. 465; *Dent* v. *West Virginia,* 129 U. S. 114, 122; *Brimmer* v. *Rebman,* 138 U. S. 282; *Crutcher* v. *Kentucky,* 141 U. S. 47; *United States* v. *Knight,* 156 U. S. 1; *West. Union T. Co.* v.

*James,* 162 U. S. 653; *Re Sanders,* 52 Fed. Rep. 807; *Henning-ton* v. *Georgia,* 163 U. S. 299; *Schollenberger* v. *Pennsylvania,* 171 U. S. 1, 24; *Railroad* v. *Ohio,* 173 U. S. 285.

It is universally accepted as the law that not only is this police power based upon the right of the State to protect *its own* citizens in matters of purely local concern, but further that the exercise of this power is limited *by the necessity* which exists for such protection. ·*Hannibal R. R.* v. *Husen,* 95 U. S. 465; *Mo. R. R.* v. *Haber,* 169 U. S. 628; *Walling* v. *Michigan,* 116 U. S. 446.

Plaintiffs in error were deprived of constitutional rights in that they were not allowed to show among other things that the coffees in question were imported for the purpose of being resold in the southern and southwestern States of this country and not in the State of New York, and that therefore the police power of the State of New York could have no proper operation with regard to such coffees, and not being allowed to show that colored coffees precisely like those in question had been for a large number of years, established and recognized commercial articles in various portions of the United States other than the State of New York, and that therefore the statute in question as applied to deliveries of such coffees in the original packages in which they were imported into the United States and to non-residents of the State of New York was unconstitutional and void. *Schollenberger* v. *Pennsylvania,* 171 U. S. 1, 7.

The goods in question, even in the light of the jury's verdict, are not such improper articles as to be·deprived of the protection afforded by the Constitution of the United States to articles of commerce.

The State could not under the guise of its police power prevent the sale of these goods in New York in the original packages in which they were imported. *Schollenberger* v. *Pennsylvania,* 171 U. S. 1, 28; *Hornblank* v. *Lagarle,* 60 Fed. Rep. 191.

As Congress has in the exercise of its power enacted legislation as to the importation of adulterated foods· pursuant to

the terms of which the coffees in question were not adulterated and were properly imported into the United States, and as these coffees had been inspected and admitted into the United States by the United States officials, a state statute in effect prohibiting the delivery of such coffees in the original packages in which they were imported is unconstitutional and void.

*Mr. Charles Stewart Davison* for defendants in error:

The statute covers the case of the admixture of any ingredient which may render such article injurious to the health of the person consuming it; and the case of the mixing with the food of any substance so as to injuriously affect its quality. It will be on all hands conceded that this general law of the State of New York is not in any wise or aspect an act passed in bad faith with the intent or for the purpose of indirectly effecting some other result than that which is apparent upon its face. The many attacks which have been made before this court on state statutes which have attempted to interfere with commerce with foreign nations or between the States under the guise of being an exercise of the police power of the particular State find no parallel here. Indeed, no such suggestion is made. The statute contemplates only proper objects, under the decisions of this court, and stands as a valid exercise of the police power of the State in the nature perhaps of an inspection law, and permitting the state authorities under it at any time to lawfully exclude from the State or confiscate any article of food obnoxious to its provisions. *Bowman* v. *Chicago & Northwestern R. R. Co.,* 125 U. S. 465; *Schollenberger* v. *Pennsylvania,* 171 U. S. 1; *Plumley* v. *Massachusetts,* 155 U. S. 461. See opinion of Court of Appeals by Mr. Justice Haight, 171 N. Y. 329. For similar statutes of other States, see Alabama, Code, § 4074, adopted 1866; Texas, Penal Code, art. 432, 1894; Mississippi, Rev. Stat. 1892, §§ 2095, 2096; Tennessee, Code 1884, § 4829 (M. and V. 5632); Louisiana, Rev. Stat. 751, Laws, 1880, act. 20, p. 23; Laws, 1882, act 82, p. 103; Missouri, Rev. Stat. 1889, § 3879, and see act

of Congress 1890, ch. 839, §§ 2, 3. As to attitude of defendant in error, see *Matter of Lurman,* 90 Hun, 303, 309.

MR. JUSTICE WHITE delivered the opinion of the court.

The law of the State of New York contained the following:
"SEC. 41. Adulterations.—No person shall within the State manufacture, produce, compound, brew, distill, have, sell or offer for sale any adulterated food or drug. An article shall be deemed to be adulterated within the meaning of this act: . . . in the case of food, . . . (6) if it be colored or coated, or polished, or powdered, whereby damage is concealed, or it is made to appear better than it really is, or of greater value." Laws of the State of New York of 1893, c. 661, section 41, being chapter 25 of the General Laws of the State of New York.

With these provisions in force, in July, 1894, the firm of Crossman & Brothers, hereafter referred to as the sellers, residents of New York city, by contract made in New York, sold to the firm of Theodore G. Lurman & Company, hereafter referred to as the buyers, residents of Baltimore, five hundred bags of Rio coffee, one-half the bags to be No. 8 grade and the other half No. 9 grade. It was stipulated that the coffee was to be shipped from Rio Janeiro to New York city by a designated steamer, the coffee to be sound or to be made sound by the sellers. The grades 8 and 9 referred to in the memorandum of sale were standard types, bearing those numbers, established by the Coffee Exchange of the city of New York, and it was agreed that the coffee was to be of the average of such types, and differences arising on the subject were to be determined by a "grader," to be selected by each of the parties, the two to select a third in the event of a disagreement, his decision to be conclusive. It was stipulated that on the arrival of the steamer and the storage of the coffee in New York the buyers were to have the advantage of the first month's storage and fire insurance, free of expense.

In due time the named steamer reached the port of New York, and the five hundred bags of coffee were stored and delivery tendered in New York city to the buyers.   Some of the coffee was accepted and the remainder was rejected, on the ground that it was adulterated, because it had been artificially colored by coating the beans with a yellow wash. Without going into the details of what transpired between the parties as a result of the refusal to accept the coffee, it suffices, for this case, to say that ultimately the graders provided for in the contract were named, and on their disagreement a third was selected, who decided that, although the coffee had been coated with the wash, its average quality was yet equal to the specified types of the Coffee Exchange referred to in the contract.   The buyers refused to abide by this finding and to accept delivery and pay for the adulterated coffee.   The sellers then disposed of the coffee for account of the buyers, and commenced this suit to recover the difference between the amount produced by the alleged sale and the contract price.   During the course of the litigation two trials were had, and the cause was twice passed on by the appellate division of the Supreme Court in and for the first judicial department.   On the first hearing in the Supreme Court it was held, in accord with a decision of the Court of Appeals of the State of New York, rendered in a collateral controversy which grew out of the refusal to accept the coffee, *In re Lurman*, 149 N. Y. 588, that if the coffee was adulterated, within the statute of the State of New York, the buyers were not bound to accept, despite the finding of the grader that it conformed to the types of the Coffee Exchange, referred to in the contract.   Finally, all incidental questions being eliminated, the cause was tried on the distinct issue whether the coffee was adulterated within the provisions of the statute.   There was a verdict and judgment for the buyers, which was affirmed by the appellate division of the Supreme Court in and for the first judicial department.   The cause having been then taken to the Court of Appeals of the State of New York, the court affirmed the

judgment of the Supreme Court and remitted the record to that court. 171 N. Y. 329. Because of such remittitur this writ of error to the Supreme Court is prosecuted to review the judgment of the Court of Appeals.

Concerning the facts of the case the Court of Appeals said, p. 335:

"The coffee tendered by the plaintiffs, which was rejected, was of a low grade, containing many poor, withered and black beans. It, confessedly, was colored and the beans coated with a yellowish substance. It is not contended that the coloring matter improved the taste or added to the value of the coffee. It is claimed that the only purpose of the coloring was to hide the character of the poor beans and to make them appear of the same character as the good coffee. The jury has found by its verdict that it was so colored as to conceal the damaged portions, or make it to appear better than it really was, or of greater value to the ordinary, untrained observer. In other words, that it was adulterated for the purposes of fraud and deception."

Applying the provisions of the health laws of the State of New York concerning the adulteration of food products already referred to, it was decided that the court below had correctly held that there was no obligation on the part of the buyer to take delivery and pay for the coffee if fraudulently colored in violation of the prohibitions of the statute. Coming to consider the contention of the sellers, that the provision of the law of the State in question was repugnant to the commerce clause of the Constitution of the United States, the Court of Appeals said, p. 331:

"The States have no power to regulate commerce with foreign countries or with each other. This power has been delegated to the Congress of the United States, and that body can, by law, determine what shall or shall not be permitted to be imported. With the right of importation follows the right of sale in original packages, and therefore the States cannot prohibit the sale of articles of commerce within their borders.

The States cannot, under the guise of inspection, or under their reserved police powers, prohibit the importation into their jurisdictions of sound meat, under the pretense that it may be damaged or decayed, or Texan cattle for fear they may be diseased, or spirituous or malt liquors for fear that they may intoxicate, or oleomargarine for fear it may be adulterated. *Railroad Co.* v. *Husen*, 95 U. S. 465; *Bowman* v. *C. & N. W. Ry. Co.*, 125 U. S. 465; *Leisy* v. *Hardin*, 135 U. S. 100; *Schollenberger* v. *Pennsylvania*, 171 U. S. 1."

Having thus fully conceded the plenary operation of the Constitution of the United States upon interstate and foreign commerce, the court proceeded to decide that the statute of the State of New York which it upheld was not repugnant to the commerce clause of the Constitution, because the State in its enactment but exerted its reserved police power to legislate for the protection of the health and safety of the community and to provide against deception or fraud. In support of this theory the court cited from the decisions of this court, to which it had referred, as showing the general rule, and additionally fortified its conclusion by reference to and citations from the opinion of this court in *Plumley* v. *Massachusetts*, 155 U. S. 461.

All but three of the many propositions embraced in the assignment of errors and urged at bar rest on the contention that the Court of Appeals misconceived the extent of the police power of the State, and therefore erroneously decided that the law of the State of New York which was applied to the case was not repugnant to the commerce clause of the Constitution of the United States. We shall not at any length undertake to review the argument made at bar to sustain this proposition, since its unsoundness will be fully demonstrated by a mere reference to the previous decisions of this court, upon which the court below based its conclusions. Indeed, every contention here urged to show that the law of New York is repugnant to the Constitution of the United States was fully and expressly considered and negatived by the decision of this court in *Plumley* v. *Massachusetts, supra*. In that case a law of the

State of Massachusetts forbidding the sale of oleomargarine, which was artificially colored, was applied to a sale in Massachusetts of an original package of that article which had been manufactured in and shipped from the State of Illinois. In the course of a full review of the previous cases relating to the subject it was said, p. 472:

"If there be any subject over which it would seem the States ought to have plenary control, and the power to legislate in respect to which it ought not to be supposed was intended to be surrendered to the general government, it is the protection of the people against fraud and deception in the sale of food products. Such legislation may, indeed, indirectly or incidentally affect trade in such products transported from one State to another State. But that circumstance does not show that laws of the character alluded to are inconsistent with the power of Congress to regulate commerce among the States. For, as said by this court in *Sherlock* v. *Alling,* 93 U. S. 99, 103: 'In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution. . . . And it may be said generally, that the legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit.'"

Again, it was said, p. 478:

"And yet it is supposed that the owners of a compound which has been put in a condition to cheat the public into believing that it is a particular article of food in daily use and eagerly sought by people in every condition of life, are pro-

tected by the Constitution in making a sale of it against the
will of the State in which it is offered for sale, because of the
circumstance that it is an original package, and has become
a subject of ordinary traffic. · We are unwilling to accept this
view. We are of opinion that it is within the power of a State
to exclude from its markets any compound manufactured in
another State, which has been artificially colored or adulterated
so as to cause it to look like an article of food in general use,
and the sale of which may, by reason of such coloration or
adulteration, cheat the general public into purchasing that
which they may not intend to buy. The Constitution of the
United States does not secure to any one the privilege of de-
frauding the public."

The assertion that the statute of the State of New York
which the court below applied is repugnant to the commerce
clause of the Constitution of the United States being thus
shown to be devoid of merit, there remains only to be consid-
ered the three propositions to which we have previously ad-
verted. We shall briefly consider and dispose of them.

1st. It is insisted that, even although it was in the power of
the State of New York to legislate for the prevention of fraud
and deception by forbidding the sale of the adulterated food
products, such prohibition could only operate upon contracts
made within or intended to be executed within the State, and
as the contract here in controversy was not of such character,
therefore the law of the State of New York was erroneously
held to control. This proposition is based on the assumption
that because the buyers of the coffee were residents of Mary-
land, therefore the contract must be treated as having been
made for the purpose of securing the shipment of the coffee
from Rio Janeiro to the residence of the buyers, hence the
city of New York was referred to in the contract merely as the
port of entry. It is insisted, *per contra*, that this proposition
was not relied upon at the trial, nor called to the attention of
the Court of Appeals of the State of New York, and should not
be now considered, because if it had been raised below it would

have been met by proof showing that the buyers, although residents of Maryland, were engaged in carrying on a business for the sale of coffee in New York city.   The suggestion that the proposition was not made below is borne out by the fact that it was not referred to by the Court of Appeals of the State of New York or in the several opinions handed down by the Supreme Court of the State of New York during the course of the protracted litigation which the cause has engendered. Be this as it may, however, we think the proposition is devoid of merit.   The contract of sale was made in New York; the storage and delivery in the city of New York was therein provided for.   It was clearly, therefore, a New York contract and governed by the law of New York.

2d. It is urged that, even although there was power in the State of New York to legislate on the subject of adulteration of food, such legislation ceased to be operative as regards food products imported into the United States through the channels of foreign commerce after the passage of the act of Congress approved August 30, 1890, "providing for the inspection of means for exportation, prohibiting the importation of adulterated articles of food or drink, and authorizing the President to make proclamation in certain cases."  26 Stat. 414.   The second section of that act, it is insisted, does not exclude from importation adulterated food but simply adulterated food which is mixed with any poisonous or noxious chemical, drug or other ingredient injurious to health, which it is urged was not the case with the coffee in question.   The language of the section upon which this contention is based is as follows:

"That it shall be unlawful to import into the United States any adulterated or unwholesome food or drug, or any vinous, spirituous or malt liquors, adulterated or mixed with any poisonous or noxious chemical, drug or other ingredient injurious to health."

We think it unnecessary to determine whether the statute lends even color to the proposition, since we think it is clear that its effect, whatever be its import, was not to deprive the

State of its police power to legislate for the benefit of its people in the prevention of deception and fraud, and thus to control sales made within the State of articles so adulterated as to come within the valid prohibitions of the state statute.

3d. In the trial court the plaintiff tendered evidence to demonstrate that there was a demand in some portions of the country for artificially colored coffee, and to the ruling of the court excluding such testimony as irrelevant exception was saved. Although the Court of Appeals, in its opinion, did not make any special reference to the subject, it is insisted that the question was called to its attention, and that in affirming the judgment it in effect sustained the action of the trial court in excluding the testimony, and thereby deprived the plaintiff of rights secured under the Constitution of the United States. The effect of the evidence, it is argued, had it been admitted, would have been to show that coffee artificially colored as a means of fraud and deception was a recognized article of commerce, and therefore the right to deal in it was protected by the commerce clause of the Constitution of the United States, and such dealings could not, therefore, be controlled by the state law. To state the proposition we think is to answer it.

It, moreover, is disposed of by the decisions of this court to which we have previously referred. Besides, the question which the case involved was the right of the sellers to contract for and deliver in the State of New York an article so adulterated and fraudulent as to be within the prohibitions of the law of New York. Further, the proof tending to show that coffee so adulterated and artificially colored as to be the convenient means of accomplishing fraud and deceit was in demand in some places outside of the State of New York, could have no legitimate tendency to cause trade in the adulterated and fraudulently deceptive article to become legitimate commerce.

*Affirmed.*