## Commonwealth, Appellant, *v.* Disanto.

*Constitutional law—Federal Constitution—Commerce clause—Sale of steamship tickets—License—Revenue—Tax—Police power of states—Acts of July 17, 1919, P. L. 1003, and May 20, 1921, P. L. 997.*

1. The states cannot levy a tax on interstate transportation, the receipts therefrom or the instrumentalities thereof, or the occupation, business or means of carrying it on.

2. Where a state statute attempts to control, regulate, fetter or burden the sundry exertions which go to make up interstate commerce, it is of no effect.

3. It is immaterial how the statute is framed; a case cannot be withdrawn from federal protection by a declaration that the act excepts interstate carriers, when its effect is to include them.

4. But the regulation of interstate commerce by Congress was never intended to cut the states off from legislating, under their police powers, on all subjects relating to the safety of their citizens, though the legislation might indirectly affect the commerce of the country.

5. The intent to supersede the exercise by the state of its police power as to matters not covered by the federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field.

6. Where reasonable measures are adopted by a state to protect its commerce as well as its people by preventing frauds and crimes, before the courts will declare such laws void it must clearly appear the enactments are of a more than local nature and have an effect

beyond the state line, or that they burden, fetter or regulate interstate commerce prejudicially.

7. A state cannot, under the guise of a penal statute or act to prevent crime, regulate and control commerce to its detriment.

8. The Act of July 17, 1919, P. L. 1003, as amended by the Act of May 20, 1921, P. L. 997, entitled "An act requiring licensees to sell steamship tickets or orders to or from foreign countries, and providing penalties," does not violate the commerce clause of the Constitution of the United States.

9. Instead of the act being a burden on interstate commerce it is a benefit; instead of obstructing or retarding, the act will accelerate commerce through a confidence that did not exist before the act was passed.

10. The requirements of the statute are no more burdensome or obstructive to interstate commerce than those statutes enacted in the exercise of the states' police power over that commerce, which have been approved by the Supreme Court of the United States in many instances.

11. Where Congress has not legislated on a particular subject relating to the protection of commerce against fraud, the states have the right, and it is even their duty, to do so.

12. The Constitution of the United States did not secure to the people an unchallenged right to commit fraud and crime, through the operation of the interstate commerce clause, merely because the national government has not seen fit to regulate or supervise that commerce in the operation of which such crimes are possible.

13. The license fee provided by the Act of 1919, is in no sense a revenue measure; it is not a tax on the sale of tickets; it does not prevent persons or property from moving from state or nation; it is not a tax on the means employed either to acquire that commerce or set it in motion; it is not a tax on an instrumentality on which the commerce is moved; and it does not inflict a burden on such commerce.

14. An individual selling steamship companies' tickets without a license, is not an agent of such companies within the meaning of the exception in the Act of 1919, where it appears that he merely sold tickets without any obligation to particular companies or any interest in their business; that he was not employed by any of them; that his authority consisted merely in a right to sell tickets at scheduled prices and remit the money; that he received no compensation from the companies; that the companies did not pay his expenses; and that the companies were not responsible for his acts.

Argued October 8, 1925.  Appeal, No. 7, May T., 1926, by Commonwealth, from judgment of Superior Court, March T., 1925, No. 18, reversing judgment of Q. S. Dauphin Co., Jan. T., 1922, No. 135, in case of Commonwealth v. Giovanni Disanto.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.  Reversed.

Appeal from Superior Court.  See 85 Pa. Superior Ct. 149.

The opinion of the Supreme Court states the facts. Commonwealth appealed.

Defendant was convicted and sentenced by the quarter sessions court but it was reversed by the Superior Court.

*Error assigned* was, inter alia, judgment, quoting record.

*Robert T. Fox,* District Attorney, and *Philip S. Moyer,* Deputy Attorney General, for appellant.—The act in question is a proper exercise of the police powers reserved to the Commonwealth: Com. v. Grossman, 248 Pa. 11.

The act does not violate the commerce clause of the Federal Constitution: Mobile v. Kimball, 102 U. S. 698; Craig v. Kline, 65 Pa. 399.

Defendant was not the steamship companies' agent, but only had mere authority to sell tickets.

*W. H. Neely,* of *Wickersham & Neely,* with him *George Kunkel,* for appellees.—Defendant was engaged exclusively in the sale of tickets to foreign ports, was therefore engaged in foreign commerce, and was improperly convicted: Texas T. & T. Co. v. New Orleans, 68 U. S. 283; McCall v. California, 136 U. S. 104.

When the power of Congress to regulate is exclusive the failure of Congress to make express regulations in-

dicates its will that the subject shall be free from regulation: Bowman v. Ry., 125 U. S. 465; Gibbons v. Ogden, 9 Wheat. 1; Welton v. Missouri, 91 U. S. 275; Covington Bridge Co. v. Kentucky, 154 U. S. 204; Pickard v. Pullman Car Co., 117 U S. 34; Brown v. Houston Coll., 114 U. S. 622.

The states, under the guise of the police power, cannot pass legislation placing a direct and primary burden on interstate or foreign commerce, where that commerce is essentially national in character: Hall v. De Cuier, 95 U. S. 485; Louisville & Nashville Ry. Co. v. Central Stock Yards Co., 212 U. S. 132; McNeill v. Ry., 202 U. S. 543.

Local police regulations cannot go so far as to deny the right to engage in interstate commerce, or to treat it as a local privilege and prohibit its exercise in the absence of a local license.

OPINION BY MR. JUSTICE KEPHART, November 23, 1925:

Disanto was convicted and sentenced in the trial court for violating an act regulating the sale of steamship tickets. The Superior Court set aside the conviction. We have allowed this appeal at the instance of the Commonwealth because of the constitutional questions involved.

The act was passed to prevent the many frauds, impositions, overreachings and criminal acts practiced on guileless and uneducated persons or those of foreign birth, who reside in the State and who do not know and understand our laws and customs; if it can be sustained it will substantially aid in abolishing these fraudulent and criminal acts. Its material parts are as follows:

"Section 1.......No person......other than railroad or steamship companies, shall hereafter engage within this State in the sale of steamship tickets or orders for transportation,......without being a citizen of the United States and having first procured......license to carry on such business. Such license shall be granted

......after......his application......[is advertised] ......once a week for four consecutive weeks.

"The application shall be accompanied by......satis. factory proof of good moral character and fitness to conduct such business properly......also......by a list of the steamship lines for which the applicant is authorized agent, which list shall not contain less than three such lines. Such license shall be granted upon approval of the application by the Commissioner of Banking and the payment......of a fee of fifty dollars, and shall be renewed on payment of a like fee annually......Every license shall contain the name of the licensee, the city, street, and number of the house in which the licensee is authorized to carry on business......

"Section 2......The Commissioner shall require the applicant......to file with the application therefor a bond......in the penal sum of one thousand dollars ($1,000) with two or more sufficient sureties......Such bond shall be conditioned that the obligor will duly account to all persons or parties having an interest for all moneys received for steamship tickets or orders for transportation, and that the obligor will not enter, engage in, or be guilty of, any fraud or misrepresentation to any purchaser of such tickets or orders, and......that suit to recover on the bond required to be filed...... may be brought by or on the relation of any party aggrieved in any court of competent jurisdiction......

"Section 3......In the event that any licensee shall ......be guilty of any such fraud or misrepresentation, or shall fail to account for any moneys paid in connection with the sale of any tickets or orders for transportation, the said Commissioner shall be empowered......to revoke the license......"

Section 4 provides for punishment for violation of the act which shall be a fine, an imprisonment or both. Act of July 17, 1919, P. L. 1003, as amended by the Act of May 20, 1921, P. L. 997.

The conviction was assailed because the application of the act to the facts involved was a violation of the commerce clause of the Federal Constitution, and further that defendant came within the exception to the act; railroad or steamship companies.

The Commonwealth here takes the position that if defendant was engaged in interstate commerce the legislation was a valid exercise of its police power; that his business was not an engagement in interstate commerce; and that he was not an agent of the steamship companies in the strict sense.

Turning our attention to the evidence we find defendant had an office in Harrisburg which was used by him in his business of selling steamship tickets and as general interpreter. He was authorized by four companies and sold steamship tickets for foreign travel from the ports of New York and Philadelphia. The sales were made at his office at Harrisburg. Advertising matter was received and posted, and notices of sailing dates were received by him. In addition to orders for tickets he received ticket books of the various companies. The office did not bear any company name, it was in defendant's house and so far as this record shows he paid the expenses of running it. There was no contract for compensation and the record does not disclose how defendant was paid for his services. To each company he gave a bond to secure that company from loss in case of default and he remitted the money received from sales a day or so after the tickets were sold. The amount of business is not stated. These are substantially the facts which defendant says bring him within the protection of the commerce clause of the Constitution and which cause the act, in its application to these facts, to so burden and fetter interstate commerce as to be unconstitutional.

It has been held many times that states cannot lay a tax on interstate transportation, the receipts therefrom or the instrumentalities thereof or the occupation, business or means of carrying it on, (Ozark Pipe Line Corp.

v. Monier, 266 U. S. 555, 69 L. Ed. 210), which includes buying, selling and the negotiations therefor, (Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 290; Real Silk Hosiery Mills v. Portland, 268 U. S. 325, 69 L. Ed. 639, 45 Sup. Ct. Rep. 525), acts accessory to and inhering in the right to make shipments or secure passengers for travel, (Heyman v. Hays, 236 U. S. 178, 186), and whatever is necessary to that right is protected. It does not include, however, the steps which go toward making up that commerce, such as the production of commodities which constitute it (Hammer v. Dagenhart, 247 U. S. 251, 272), nor to the production of materials which make the movement of the commerce possible: Del., Lack. & West. R. R. Co. v. Yurkonis, 238 U. S. 439, 444-5. Where a state statute attempts to control, regulate, fetter or burden the sundry exertions which go to make up interstate commerce, it is of no effect. It is immaterial how the statute is framed, a case cannot be withdrawn from federal protection by a declaration that the act excepts interstate carriers, when its effect is to include them: Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 271; Dahnke-Walker Milling Co. v. Bondurant, supra; St. Louis S. W. Ry. v. Arkansas, 235 U. S. 350, 362.

There is an exception to the general rule above stated, an expression of which is contained in a number of cases. In Sherlock v. Alling, 93 U. S. 99, 103, it is stated that "in conferring upon Congress the regulation of commerce, it was never intended to cut the State off from legislation on all subjects relating to the......safety of their citizens, though the legislation might indirectly affect the commerce of the country." In Sioux Remedy Co. v. Cope, 235 U. S. 197, 201, it is said, "Through a long series of decisions dealing with the scope and effect of the commerce clause it has come to be well conceded that a State......[has] power to adopt reasonable measures to promote and protect the......safety...... of its people,......even though interstate commerce be incidentally or indirectly affected." In Savage v. Jones,

225 U. S. 501, which applied the principle that a state cannot, under cover of exercising its police power, undertake the regulation of interstate commerce or impose a direct burden thereon, it was said at p. 525, "But when the local police regulation has real relation to the suitable protection of the people of the state, and is reasonable in its requirements, it is not invalid because it may incidentally affect interstate commerce, provided it does not conflict with legislation enacted by Congress pursuant to its constitutional authority"; and it is further stated (page 522) that "the intent to supersede the exercise by the State of its police power as to matters not covered by the federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field. In other words, such intent is not to be implied unless the act of Congress fairly interpreted is in actual conflict with the law of the State." But, as stated in Sioux Remedy Co. v. Cope, supra, 201, the State "has no power ......by the imposition of conditions to fetter their right to carry on such commerce, or to subject them, in respect to their transactions therein, to requirements which are unreasonable or pass beyond the point of suitable local protection." So the question we are now discussing lies within narrow lines.

In determining whether these general rules have been violated or the case is within the exception, the entire purpose of the statute as stated must be kept in mind. We will later consider the exemption of common carriers, their agents or employees. Remembering the restrictions as interpreted by the Federal Supreme Court, nevertheless, where reasonable measures are adopted by a state to protect that commerce as well as its people by preventing frauds and crimes, it must clearly appear the enactments are of a more than local nature and have an effect beyond the state line, or that they burden, fetter, or regulate interstate commerce prejudicially before the court will declare such laws void. The Con-

stitution of the United States did not secure to the people an unchallenged right to commit fraud and crime, through the operation of the interstate commerce clause, merely because the national government has not seen fit to regulate or supervise that commerce, in the operation of which such crimes are possible: Plumley v. Mass., 155 U. S. 461, 468, 472. But a state cannot under the guise of a penal statute to prevent crime regulate and control commerce to its detriment.

The act before us is an effort to prevent fraud and unfair dealing against purchasers of steamship tickets committed by those in like position as defendant. We have in our vast mining and manufacturing sections large numbers of foreign people. It is to this class the mischief, which is a matter of common knowledge, is greatest. The State thus assures to intending travelers that when orders for tickets are presented at the ports, they will be honored, and that money paid for or on account of tickets will not be lost to their detriment; the ticket seller is thus held to strict accountability. Heretofore when agents absconded with money or otherwise misbehaved, in most cases, the persons injured, through ignorance, would not follow up their right and had no effective remedy if they did attempt to secure relief. The act is very simple. It requires some investigation by the banking department to determine the applicant's fitness, honesty and likelihood to deal fairly. This investigation of character should be no different in kind or quality from that which any honestly inclined steamship company should make of its own representatives. But where, in the scramble for business, no investigation is made, and individuals who are not responsible are permitted to sell, it is then harm is done. That a bond, small in amount, is required does not hamper interstate business,—it is not directed against that commerce. We shall speak of the license fee later. Instead of the act being a burden on interstate commerce it is a benefit; instead of obstructing or retarding, the act will

accelerate interstate commerce through a confidence that formerly did not exist. In the language of Savage v. Jones, supra, 524, "The evident purpose of the statute is to prevent fraud and imposition,......a matter of great importance to the people of the State. Its requirements were directed to that end, and they were not unreasonable. It was not aimed at interstate commerce, but without discrimination sought to promote fair dealing."

The requirements of the statute are no more burdensome or obstructive to interstate commerce than those statutes enacted in the exercise of the states' police power over that commerce, which have been approved by the Supreme Court of the United States, such, for instance, as the restrictions imposed on the sale of oleomargarine (Plumley v. Mass., 155 U. S. 461); state inspection laws as to fertilizers, with provision for fees (Patapsco Guano Co. v. North Carolina, 171 U. S. 345); the same character of law with regard to food for cattle (Savage v. Jones, supra); statute forbidding the shipment of immature or unfit citrus fruit (Sligh v. Kirkwood, 237 U. S. 52, 60); acts regulating head lights on engines used in interstate commerce (Atlantic Coast Line R. R. Co. v. Georgia, 234 U. S. 280, 290); regulation of a carrier's liability for loss of interstate shipments (Missouri, Kansas & Texas Ry. Co. v. Harris, 234 U. S. 412, 216); an act penalizing the transportation of cattle which have not been inspected by state officials: Asbell v. Kansas, 209 U. S. 251. See Bowman v. C. & N. W. Ry. Co., 125 U. S. 465, 589; Crossman v. Lurman, 192 U. S. 189, 199; Reid v. Colorado, 187 U. S. 137, 149; Compagnie Francaise v. Louisiana, 186 U. S. 380, 391; Missouri, Kansas & Texas Ry. Co. v. Haber, 169 U. S. 613; Smith v. Alabama, 124 U. S. 465, 480; Sherlock v. Alling, 93 U. S. 99; Nashville, Chattanooga & St. L. Ry. v. Alabama, 128 U. S. 96; Hennington v. Georgia, 163 U. S. 299; New York, N. H. & H. R. R. Co. v. New York, 165 U. S. 629; The Minnesota Rate Cases, 230 U. S. 352, 402. Some of the cases show state regulations

the effect of which must pass the state line and embody what may be termed regulation and control of far-reaching import.

It has been stated that a subject which is confined to Congress is not within the police power of a state (Leisy v. Hardin, 135 U. S. 100, 108; Clark Distilling Co. v. Western Md. Ry. Co., 242 U. S. 311. 328) but these citations must be considered exceptions if the above doctrine is applicable. These two latter cases have reference, however, to an exercise of power which regulates the major or national policy as it operates over interstate commerce generally. Small matters or those of a local nature or of incidental means are not affected. They do not hinder a state from preventing criminal acts dealing in that commerce. Indeed, "it is not too much to say that the State was under an obligation to establish such regulations as were necessary or reasonable" for such protection as the statute here involved affords, Congress not having legislated on this subject: Chicago, Rock Island & Pacific Ry. Co. v. Arkansas, 219 U. S. 453, 465. Appellee seems to think that because West Virginia, New Jersey and other states have a foreign population Congress should legislate, and unless it does under the theory of Leisy v. Hardin, supra, fraud and crime should proceed unmolested in this State. The whole tendency of this act, as stated in Savage v. Jones, supra, has a reasonable relation to the protection of interstate commerce in its local touch.

The license fee is in no sense a revenue measure, in amount it scarcely covers the clerical hire and cost incident to making the investigation and issuing the certificate. The fee is a mere incident to procuring the certificate from the State. It is not a tax on the sale of tickets, and does not prevent persons or property moving from State or Nation; nor is it a tax on the means employed, either to acquire that commerce or set it in motion; nor is it a tax on an instrumentality by which the commerce is moved; nor does it inflict a burden on

such commerce. The fee does not come from the carrier or the persons or property moving, it comes from the applicant alone. It is in many ways similar to the licensing of locomotive engineers, after examination.

We come to the further question, Was defendant within the exception? If so, the act, under our construction, does not require steamship or railroad companies, their agents or servants or national or state banks or trust companies, who frequently sell such tickets, to take out a license.

It has been stated that the protection of interstate commerce is practical and substantial: Heyman v. Hays, 236 U. S. 178, 186, so should be the facts making up that commerce. If everything that touches interstate commerce is brought under the protection of the commerce clause, to carry the reasoning to its utmost there would be little left for the states to do by way of protecting its own citizens. In determining whether this defendant was engaged in interstate commerce in the sense in which that term has been broadly used, as representing a carrier, his business must be considered. By it we differentiate his duty to himself and to the various companies from whom he had authority to sell tickets. What may be said in this connection is equally applicable to the first branch of the case, as will appear when we point out the difference between McCall v. California, 136 U. S. 104; Texas Transport & Terminal Co. v. New Orleans, 264 U. S. 150, and the present case.

McCall was an employee of a railroad company. As their servant with specific duties to perform, his labors were centered in procuring service for his master, an interstate carrier. The connection was complete between him and the interstate carrier he represented as to duties, responsibilities and interest. It was the same as if his company had established a branch office for the purpose of procuring business, as the Norfolk & Western Railroad did in Pennsylvania when this State attempted to tax it. Norfolk & Western R. R. Co. v. Pennsylvania,

136 U. S. 114. Primarily, the employee's engagement was absolutely in the interest of his company; whatever he did was for it. It was the interstate carrier's business, not his business. In the Texas Case, what was done by an individual in the McCall Case, supra, was done by a corporation on a much larger scale, securing freight and passenger service for steamship and railroad companies. The company was a regularly employed agent under a contract fixing compensation. Its services consisted in soliciting and engaging commerce, designating ships, arranging for delivery of that commerce to the wharves, issuing bills of lading under the name of the shipowners or charterers, arranging for stevedores for loading and discharging cargos, collecting freight charges, paying ships' disbursements, attending to immigration services and assisting generally in local customs and regulations. As such agent, it was authorized to quote freight rates and issue receipts in the name of the principals for cargos delivered on the wharf. These duties were similar in scope to those of a single agent. The practice of corporations managing one or more companies, instead of a president or manager doing so, seems to be growing. There is no reason why an agent for a company should not be a corporation that may at the same time occupy the same relation to other concerns, provided, of course, in its divers obligations, each corporation should be treated with fairness. The dividing line is not the number of concerns represented but whether duties are such as to cause it to be the employee or agent for its principals, rather than occupying a position in the nature of an independent contractor as defendant was here. In neither of the above cases were the acts aimed at fraud, imposition and over-reaching. They were revenue measures creating an occupation tax, which, though fixed in amount in its class, varied in the same kind of business according to grade. This was a tax on interstate business. Therefore the facts in the McCall and Texas Cases, supra, would bring the

person and the company there proceeded against clearly under the exception stated in our statute.

There is this further difference in the occupation or business of the defendant here and the transportation company there. Here, the defendant merely sells tickets; he is a free lance with no obligation to any particular company or any named in the record. In other words, he has no interest in any or all concerns as to furthering their business. He is guided entirely by his own judgment, and his interest in the sale of tickets is entirely personal, furthering his own business not the business of these companies. He was not employed by any of them, his authority, as evidenced by papers submitted, did not amount to an agency or an employment. It consisted merely of a right to sell tickets at scheduled prices. The company assumed no obligation beyond that expressed in the certificate and this right was revocable at a moment's notice. It assumed no responsibility for his wrongful acts as it would of an employee. He received no compensation, the companies paid none of his expenses so far as the record shows; the bonds that were given to the companies protected only the company, not the purchasers. Barring the remittance of the money, the companies have absolutely no interest in his business, and outside of the money he is under no liability to them. If he charges more than the normal fare and keeps the difference, the only way the companies could reach him would be to dismiss him. His business was personal as distinguished from that of the agent or employee in the McCall Case or from the corporation performing the same service as a personal employee or agent in the Texas Case. The difference is manifest.

Defendant is not an agent of an interstate or foreign carrier within the meaning of the term under the exception in our act. The statute requires individuals, who propose to transact a certain business in which the public is interested, to take out licenses that the public

may be protected from unlawful acts.  The fact that the act found defendant engaged in selling tickets would not change his status.  He was not the agent or employee of the steamship companies or connected with a company engaged in interstate commerce as a business and whether the commerce clause is intended to cover independent operators who travel through this State or have a fixed place of business in the State, who buy to sell in other states, need not be decided in this case.

Robbins v. Shelby County Taxing District, 120 U. S. 489, is not a parallel case.  There the State of Tennessee imposed a license tax on a drummer for soliciting orders for a firm in Cincinnati, and it was held solicitation constituted a part of interstate commerce.  That case is within the reasonings of McCall v. California, supra. Davis v. Virginia, 236 U. S. 697, was an attempt to compel a licensing of a soliciting agent for a New York firm selling pictures.  It was held that furnishing an opportunity to do interstate commerce business was within the protection of the commerce clause.  This case is like the preceding one, as is also Crutcher v. Kentucky, 141 U. S. 47; Adams Express Co. v. New York, 232 U. S. 14; Real Silk Hosiery Co. v. Portland, supra, 69 L. Ed. 639, 45 Sup. Ct. Rep. 525; Shafer v. Farmer's Grain Co., 268 U. S. 189, 69 L. Ed. 19, 45 Sup. Ct. Rep. 481.  The agents in these cases, as agents or servants of the various companies, would come under the exemption mentioned in the act and they would not have to be licensed. Attention is called to Wagner v. Covington, 251 U. S. 95, where Covington, Ky., imposed a tax on articles that were manufactured in Cincinnati.  We are clearly of the opinion that the act should be sustained and the Superior Court was in error in reversing the court below. Other questions raised are deemed unnecessary to the decision of this case.

The judgment of the Superior Court is reversed and that of the court below reinstated, and record remitted for the defendant to comply with the sentence of the court below.