SOLOMON, D. B. A. SOLOMON NEWS CO., v. CITY OF CLEVELAND ET AL.

*Municipal corporations—Ordinance prohibiting vending periodicals containing horse racing news and tips—Same construction applied in determining constitutionality of statutes and municipal charters—Constitutionality of legislation favored—Exercise of police power by Cleveland council under home rule charter—Ordinance not oppressive as interfering with personal or property rights—Or because applicable to newspapers published outside of Cleveland—Interstate commerce or freedom of press not interfered with—Section 8, Article I, United States Constitution—Article I, Amendments to United States Constitution.*

1. Same methods of construing laws prevail in applying constitutional prohibitions to charter cities as prevail in the construction of laws enacted by state legislature.
2. Judicial department of government should not declare statute of state unconstitutional unless it is clearly and manifestly so, and, so long as by any fair interpretation of Constitution, legislation can be upheld, it is duty of court to so uphold it.
3. City council of city of Cleveland, operating under home rule charter, is acting as an arm of separate state within confines of city of Cleveland and under police power can legislate upon subjects and forbid doing of certain acts which are deleterious and harmful to the whole people.
4. City of Cleveland, under its charter, had authority, in ex-

ercise of police power, to pass ordinance making criminal vending of papers and periodicals not entirely devoted to such matters, containing horse racing news and tips on horse racing.

5. Ordinance of city of Cleveland, making criminal selling newspapers or periodicals containing horse racing news and tips on horse racing, and what purports to be tips on horse racing, *held* not oppressive as unreasonably interfering with either property or personal rights, since newspaper publisher has no property right in privilege of corrupting public morals.

6. Ordinance of city of Cleveland, making it a criminal offense to offer to sell newspapers or periodicals containing horse racing news and tips on horse racing, *held* not oppressive and unreasonable because it applies to newspapers and periodicals published outside of the city, since only a small proportion of people read outside newspapers.

7. Ordinance of city of Cleveland, making it criminal offense to offer to sell newspapers or periodicals containing horse racing news and tips on horse racing, *held* not to violate interstate commerce clause of the U. S. Constitution, Article I, Section 8, because it prohibits sale of newspapers published in other states.

8. Ordinance of city of Cleveland, making it criminal offense to offer to sell newspapers or periodicals containing horse racing news or tips on horse racing, *held* not to conflict with provision of First Amendment of U. S. Constitution, relating to freedom of press, since such provision does not extend to privilege of publishing and disseminating baneful and harmful matter.

(Decided July 1, 1926.)

Appeal: Court of Appeals for Cuyahoga county.

*Mr. T. J. Herbert,* for plaintiff.
*Mr. C. F. Shuler,* for defendants.

Vickery, J. This action came into this court on appeal from the common pleas court of Cuyahoga

county. The Solomon News Company is a corporation, I believe, engaged in the dissemination of news through magazines and newspapers and other articles of trade in the city of Cleveland, and has been established for a number of years. This action is brought in its behalf to enjoin the city from enforcing the provisions of a certain ordinance adopted by the city council, which attempted to prevent the vending of any papers or periodicals which contain horse racing news or tips on horse races, and the having for sale and selling the same in the city of Cleveland was made a misdemeanor punishable, etc.

The issues were so joined that the only question for this court to decide—and it was the only question decided by the common pleas court—is: Can the city council of Cleveland, under its charter powers, pass such an ordinance, and is it valid under the Constitution of Ohio and the Constitution of the United States?

Under the Home Rule Amendment (Article XVIII, Sections 3, 7, 8, 9) to the Constitution of Ohio of 1912, cities were authorized to create a city government by charter. Under this provision of the Constitution, the city of Cleveland early became a charter city, and a series of decisions by our Supreme Court, some of which have been sustained by the Supreme Court of the United States, hold that within the sphere in which the city may have local self-government charter cities are governing, even though they conflict with the state statutes. It is well to know this, for this in effect creates of it a small state, and the same methods of construing laws prevail in applying constitutional prohibitions

to it as prevail in the construction of laws enacted by the state Legislature.

It is not necessary to cite authorities, but there are numerous cases in this state upon this proposition. The doctrine is well settled in the United States that the judicial department of the government should not declare a statute of a state unconstitutional unless it is clearly and manifestly so. Courts in fact have gone a great length to keep each separate department of the government within its own proper sphere, and, so long as by any fair interpretation of the Constitution the legislation can be upheld, it is the duty of the court to so uphold it. It matters not how unwise or inopportune such legislation might be.

Applying that doctrine to the instant case, we have several things to consider. The evident purpose of this legislation by the city council was to prevent the dissemination of news known as racing forms, relating to horse racing and the giving of tips and odds relating to the horses that are likely to win, or in horse racing matters generally. I presume if one were to point to the greatest evil in our body politic, it would be the gambling tendency. Among the causes of crime, in the way of defalcations, embezzlements, and the dire results which follow as an aftermath, gambling is the greatest of all. I speak of this so as to bring it within the domain of the power recognized in the Constitution of Ohio and the Constitution of the United States as the police power. Having a purpose in mind, the upbuilding and uplifting, the betterment of the inhabitants of a community, the courts have gone to a great length to sustain legis-

lation which tends to bring this about, even though at times it would seem to infringe the much-vaunted right of the freedom of speech and the liberty of the press. While no one would claim that the Legislature should assume the role of making each man his brother's keeper, yet the courts have gone at great length to sustain legislation which had that purpose in mind.

It must be remembered that the city council is acting as an arm of a separate state within the confines of the city of Cleveland, and it, under the police power, can legislate upon subjects and forbid the doing of certain acts which are deleterious and harmful to the whole people. Starting out, then, with the proposition that gambling and betting on horse races is an evil, and that the legislative authority has a right to check that evil, we must conclude that the aim of the legislative body of the city of Cleveland was directed along a legitimate line of inquiry to provide laws which tended to prevent gambling. Now this ordinance is broad, and it makes it a criminal offense to offer to sell a newspaper or periodical containing horse racing news and tips on horse racing, and what purports to be tips on horse racing. That applies to newspapers and periodicals published within the city as well as to those outside of the city that are brought into the city to be sold.

That the state, and consequently the city, under its charter, has the right to make criminal the vending of papers chiefly or entirely given to horse racing, and spreading news which incites gambling, or tends to incite gambling or betting on horse races, is unquestioned. In the case of *State of Con-*

*necticut* v. *McKee,* the Supreme Court of Connecticut decided that question without any equivocation. This case is not only reported in the Connecticut Supreme Court Reports (73 Conn., 18, 46 A., 409, 84 Am. St. Rep., 124), but also in 49 L. R. A., at page 542, and there is an abundance of authority besides this upon this proposition.

The question then is: Can.it be made to apply where the prohibited matter is contained in publications devoted not entirely to the publication of such news? In other words, if the prohibited matter be contained in a newspaper of general circulation, or in a magazine not entirely devoted to such matters, can legislation prevent the selling of that paper or that magazine within municipal bounds? Bear in mind that, if there be one column of the prohibited matter in a newspaper devoted otherwise to legitimate news, the evil is just as well accomplished, and, if the legislative authority is powerless to prevent selling of a newspaper which is devoted only partly to the dissemination of such news, then of course the legislation would be futile.

It speaks well for the newspapers and publications of the city of Cleveland that they have voluntarily forborne publication of such news, so-called, pending this litigation, and no one has heard them complain that they have lost any patronage or that there have been any evil results from their declining to print such news.

It must be borne in mind that gambling in any form is a crime in every state of the Union, and if it be admitted, or if it can be argued, that the dissemination of this news should be permitted through the columns of newspapers, then those

which publish this sort of news are aiding and abetting a crime. Can it be said that the legislative authority is without power to prevent this? No publisher of a newspaper or periodical has a property right in the debauching of his fellow citizens and the making of it easy for them to go astray.

I think, from an analysis of this ordinance, and from the purpose for which it was passed, that regulation of the evils at which it was aimed is clearly within the police power of the city of Cleveland, and that council has the right and power to pass this legislation, and that it is a valid exercise of power.

This case was so well considered and analyzed by the learned trial judge that I am appending and adopting as part of my opinion his opinion rendered in this case. I think the analysis is accurate and his conclusions are just and right. It reads as follows:

"Without taking any time to make any statement of the issues, a brief announcement of the holding of the court and the reasons therefor is as follows:

"1.    Betting on horse races as usually practiced is a species of gambling.

"2.    The publication of betting odds, or tips on horse racing, encourages, promotes, and incites this species of gambling.

"3.    To prevent such is a proper and legitimate purpose of government. The charter of the city of Cleveland contains, among other things, the following, to-wit:

" 'The inhabitants of the city of Cleveland shall be a body politic and corporate by name the city

of Cleveland,  *  *  *  and as such  *  *  *  may
define, prohibit, abate, suppress and prevent all
things detrimental to the health, morals, comfort,
safety, convenience and welfare of the inhabitants
of the city, and all nuisances and causes thereof.'

"4. The prevention of gambling is within the
express powers of the city charter.

"5. Such power may be exercised unless in so
doing some constitutional right of citizens affected
thereby be invaded and violated.

"6. To be within constitutional provision, state
and federal, the ordinance in question must con-
form to the following requirements, to-wit:

"First. It must be enacted for a proper gov-
ernmental purpose. It seems unnecessary to en-
large on the proposition that government may con-
cern itself, within reasonable limits, to promote
good morals.

"Second. Such legislation must tend in a rea-
sonable degree to accomplish the purpose for which
it is enacted.

"Third. The benefits to society reasonably to
be expected must not be out of proportion to the
restraint imposed and the detriment inflicted on
citizens by such restraint.

"Fourth. Such legislation must not be in con-
flict with the provision of the federal Constitution
relating to interstate commerce.

"Fifth. It must not be in conflict with the pro-
vision of the Federal Constitution relating to the
freedom of the press.

"After a careful consideration of all of these
requirements, in my judgment the ordinance in
question does coincide with all of them. It is urged

the law will be disregarded and evaded and fail of its purpose. Such kind of legislation has always met with that objection. Experience has universally shown the opposite to be true. Step by step public morals have been promoted by governmental action. This particular application of legislation is recent, but this ordinance is not the first of its kind, and, while there may be difficulties in the way, they are not such as to warrant the view that a reasonable degree of success will not follow an honest effort to carry out the purpose of the law.

"The ordinance is not oppressive. It does not unreasonably interfere with either property or personal rights. It will hardly be contended that a citizen may gamble either as a personal or property right. And, if no such personal or property right exists on the part of one who would gamble, if permitted, how can it be claimed that a citizen has either a personal or property right in that which materially encourages and incites another to gamble and materially facilitates the purpose and efforts of the would-be gambler?

"But it is urged that the medium of information which does so facilitate gambling is also the medium that promotes in the highest degree the general welfare of all the people, and that to interdict the bad also interdicts the good. Such does not follow by any means. I refer to the daily press. The proportion of would-be gamblers, as compared with those having no inclination to become such, is almost infinitesimal, and the daily press would not suffer the loss of any substantial rights in omitting altogether such information, and in the interest of

public morals and the general welfare can very well afford to do so voluntarily, and in the end would be the gainer thereby from a purely selfish standpoint. At any rate, it has no property right in the privilege of corrupting public morals. But it is urged that the ordinance is oppressive and unreasonable because of its local application, and that this is so because of the nature of the medium conveying such information, and by the medium is meant the daily press.

"This is another age-old objection to legislation of this character. Again I call attention to the proportionate numbers as between those who are served by the local press and those who are served by the outside press. This suggests one difficulty. But it is not insurmountable. Government itself is based upon the proposition that certain inherent natural rights of the individual must be surrendered for the common good of all. If this principle were not applied, government could not exist. Nearly a million people are served in the city and community by the local press. A few thousand read, in addition, an outside newspaper. There is nothing in this situation to make the ordinance unreasonable. The good of the entire community is of more moment than the personal convenience of the few. Neither the publishers of outside newspapers nor their distributors can be heard to complain. Their rights and privileges do not rise higher than the general good of the entire community.

"The benefit arising from such legislation does not consist alone in a tendency to prevent and suppress gambling with respect to horse racing. It

helps to maintain a high standard of civic welfare. Cleveland is known as one of the most progressive and well governed of all the great cities of the country. Such reputation is a valuable asset to all its people. There is no merit in the claim that the ordinance is unfair and oppressive, and that any disadvantages, if there be any, will be excessive in proportion to the general benefits.

"With respect to the reasonableness of such legislation, another observation may be made. That which is esteemed fair and reasonable to the great middle class of any citizenship generally is in fact fair and reasonable. What is reasonable is not to be determined by the small numbers actuated by selfish motives or criminal tendencies, on the one hand, or by the still smaller numbers of the so-called intellectuals, on the other, who are by their assumed sense of superiority incapable of forming a sound judgment of the best interests of the whole people. The common people may sometimes be wrong, but generally they are right, and generally they support and uphold this class of legislation. Taking note of the position of this large class of citizenship on moral questions, there is little room to doubt its attitude on this question.

"It is also urged that the ordinance would prohibit the lawful sale of newspapers published in other states, and thereby interfere with interstate commerce, and thus violate the provision of the federal Constitution in relation thereto.

"To this I say it has been repeatedly held by the Supreme Court of the United States that legislation by one state, or a division thereof, to promote the moral welfare of its people, or to conserve their

health, although such may in a measure interfere with interstate commerce, is not in violation of any provision of the federal Constitution. With respect to such holdings, I content myself in citing, without reading therefrom, three authorities, as follows: *Plumley* v. *Commonwealth of Massachusetts,* 155 U. S., 461, 15 S. Ct., 154, 39 L. Ed., 223; *Crossman* v. *Lurman,* 192 U. S., 189, 24 S. Ct., 234, 48 L. Ed., 401; *Capital City Dairy Co.* v. *Ohio,* 183 U. S., 238, 22 S. Ct., 120, 46 L. Ed., 171.

"Finally, I call attention to the claim that the ordinance is in conflict with the provision of the federal Constitution in relation to the freedom of the press, both as it may affect the contents thereof and the distribution of the papers. But it has never been held that such provision extends to the privilege of publishing and disseminating baneful and harmful matter. The evidence in this case is that such information by its distribution has encouraged, promoted and increased this species of gambling. And why not? What other motive for its dissemination can there be? Who wants it and why is it published? And why is it wanted? It holds out a temptation to gamble. It has the effect of inducing certain members of society to take a chance. It is a direct invitation to gamble, and it is acted on. And yet every state in the Union has laws for the suppression of gambling. Does the Constitution guarantee to the press the rights and privilege to invite and incite the people to violate such laws? Will any right-minded person seriously so contend?

"But this question has been passed on and settled by the Supreme Court, wherein it is held [*Ex parte*

*Rapier,* 143 U. S., pages 110, 111, 12 S. Ct., 374, 36 L. Ed., 93]:

" 'That in excluding various articles from the mails the object of Congress is, not to interfere with the freedom of the press, or with any other rights of the people, but to refuse the facilities for the distribution of matter deemed injurious by Congress to the public morals.'

"The city of Cleveland may, with absolute right, refuse to furnish a market place for publication deemed injurious to public morals, and substantially tending to invite the violation of law by its citizens.

"For the reasons I have very briefly stated, I hold the ordinance to be valid and not in violation of constitutional rights, and a permanent injunction is refused and the temporary injunction heretofore granted is dissolved, and a decree may be entered accordingly."

Besides the authorities cited by Judge Worley, there are a great many authorities cited by counsel in his brief bearing upon this question, and one can come to no other conclusion than that the legislation is a valid exercise under the police power of the state and is constitutional.

*Injunction denied.*

SULLIVAN, J., concurs.
LEVINE, P. J., dissents.