BISH et ux. v. EMPLOYERS' LIABILITY
ASSUR. CORP., Limited.
Civ. A. No. 3310.

United States District Court
W. D. Louisiana, Shreveport Division.
Jan. 28, 1952.

344

Lunn, Irion, Switzer, Trichel & Johnson, and Richard H. Switzer, all of Shreveport, La., for plaintiffs.

Cook, Clark & Egan and Benjamin· C. King, all of Shreveport, La., for defendant.

DAWKINS, District Judge.

Plaintiffs, Mrs. Marie Bish and her husband, James N. Bish, residents of the City of Shreveport, citizens of Louisiana, sued in tort the defendant, a foreign corporation and citizen of New York, for the repective sums of $50,000 and $539.31, for alleged injuries of the wife and medical expenses caused by the use of a "Toni Home Permanent" Set upon her hair. They alleged that the set was sold to them by Broadmoor Drug Company as a retailer for the Toni Company, a division of the Gillette Safety Razor Company of Chicago, Illinois, whose insurer against liability was the defendant in this case. The husband's claim, as head of the community, is for medical, hospital and nursing bills incurred because of the injuries to the wife.

In an amended complaint, Mrs. Bish has raised her demand to $195,000, charging that the injuries had subsequently caused the development of certain diseases which have increased her pain, suffering and disfigurement and permanently disabled her.

■■ It is obvious that the claim of the husband is far below the minimum jurisdictional amount of this court, a circumstance of which it must take notice ex proprio motu. It therefore must be dismissed for want of jurisdiction, since the amount cannot be combined with that of the wife for such purposes.

The nature of the motion to dismiss now to be considered is such that no recital of details of either the injuries or the character of the alleged negligence is necessary. The grounds in substance are as follows:

1. The policy sued on was executed in Massachusetts, delivered in Illinois, and provided that: a) "all of its terms should be fully complied with," and b) that the obligation of the insurer to pay "shall be finally determined either by judgment against the insured after final trial or by written agreement with the insured, the claimant and the insurance company";

2. That no one should have "any right to join the company as a ·co-defendant in any action against the insured to determine the insured's liability";

3. That said stipulations were entirely lawful and valid under the laws of Massachusetts, where the policy was issued, and in Illinois, where it was delivered; and

4. Finally, Acts 541 and 542 of the Louisiana Legislature of 1950 [LSA–R.S. 22:655, 22:983, subd. E], in their application to this case, are invalid, because the result would:

"(a) impair the obligations of defendant's contract with the Toni Company.

"(b) deny to defendant its right to have the Courts of Louisiana and the Federal Court sitting in Louisiana give full faith

and credit to the public acts affecting, and judicial proceedings of the State of Massachusetts.

"(c) deprive defendant of its property and rights without due process of law;

"(d) deny to defendant equal protection of the law."

In the case of Bayard v. Traders & General Ins. Co., D.C., 1951, 99 F.Supp. 343, the writer had occasion to consider the applicability of these two statutes under a policy issued and delivered in the State of Texas, wherein the "no action" stipulation was valid, and a similar motion to dismiss was sustained. However, counsel for plaintiff here, in a very able and exhaustive brief, seek to distinguish that case on the ground that it arose at a time when the Louisiana law expressly confined its application to policies written or delivered within its borders. On the other hand, counsel for defendant just as strongly contends that those circumstances could make no difference because the Bayard case has not to this day been tried on its merits so as to bring it within the ruling of Belanger v. Great American Indemnity Co., 5 Cir., 1951, 188 F.2d 196, which had been finally tried and decided in the trial court before the law was changed. The statutes now include all contracts of insurance, whether made within or without the state, and require insurance companies to file written consent to be sued in a direct action as a condition precedent to doing business in Louisiana.

Therefore, we are now confronted squarely with the issue of the validity of Acts 541 and 542 of 1950, insofar as they attempt to give a direct action against an insurer under a policy written and delivered outside the state, as well as the requirement that foreign corporations file written consent to be so sued directly. The defendant, it is admitted, filed such consent, as the price of doing business in the state.

At the outset, it is proper to say that in the Bayard case the court gave no consideration to the fact that the accident happened before the change in the state law, and the Court of Appeals for this Circuit sustained the ruling of the trial court in the Belanger case expressly upon the ground that it had been finally tried and decided below at a time when that law confined its operation to policies *issued* or *delivered* within the state, that court expressly pretermitting the issues here.

After careful consideration of the arguments and authorities cited by plaintiff, the writer is still of the view that if these statutes are to be held valid at all, their operation must be confined to Louisiana contracts. Any other conclusion would give them an extraterritoral effect not permissible. In the first place, business such as that conducted by the defendant throughout the nation involves interstate commerce, as was held in U. S. v. Southeastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. Because of that decision, Congress passed what is known as the McCarran Act, 59 Stats. 33, 15 U.S.C.A. §§ 1011–1015, the pertinent provisions of which are as follows:

"Sec. 1. The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance * *."

The South-Eastern case had upheld the conviction of certain persons and corporations under the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note, which was followed by the McCarran Act; and in 1946 the Supreme Court was called upon to interpret its effects in Prudential Insurance Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342, on the power of the State of South Carolina to

tax a foreign insurance company. That state had for years imposed a tax of 3% upon the gross revenues arising in the state of foreign insurance companies, which in the South-Eastern case had been declared to be engaged in interstate commerce. The Prudential, therefore, attacked it as discriminatory and unconstitutional. The Court, after pointing out that Prudential had paid the tax for many years without dire results, concluded that the exaction was not unreasonable, and said:

"Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects.

"Moreover, in taking this action Congress must have had full knowledge of the nation-wide existence of state systems of regulation and taxation; of the fact that they differ greatly in the scope and character of the regulations imposed and of the taxes exacted; and of the further fact that many, if not all, include features which, to some extent, have not been applied generally to other interstate business. Congress could not have been unacquainted with these facts and its purpose was evidently to throw the whole weight of its power behind the state systems, notwithstanding these variations.

"It would serve no useful purpose now to inquire whether or how far this effort was necessary, in view of the explicit reservations made in the majority opinion in the South-Eastern case. Nor is it necessary to conclude that Congress, by enacting the McCarran Act, sought to validate every existing state regulation or tax. For in all that mass of legislation must have lain some provisions which may have been subject to serious question on the score of other constitutional limitations in addition to commerce clause objections arising in the dormancy of Congress' power. And we agree with Prudential that there can be no inference that Congress intended to circumvent constitutional limitations upon its own power."

The contract in the present case, as stated earlier, was made in the State of Massachusetts and delivered in the State of Illinois, in both of which the "no action" clause requiring that any claim against the insured be liquidated before suit could be maintained against the insurer for indemnification, was valid. Therefore, since the insurance business, when conducted across state lines, has thus been declared to be interstate commerce, and the power of the states to regulate it within reasonable bounds, unaffected by "affirmative" Congressional action, it remains to be determined whether these Acts of Louisiana are in conflict with any other provision of the Federal Constitution besides the Commerce Clause, art. 1, § 8, cl. 3, or are so arbitrary and unreasonable as to amount to a denial of equal protection of the law.

Before dealing directly with the problem, it might be well to point out certain well known considerations entering into this matter which cannot be ignored. In the first place, it is a matter of common knowledge that protection of the individual, especially those of small means, against financial involvement, and sometimes actual ruin, by a single accident, has evolved a system of protection by which, for the payment of comparatively small sums, the owners of motor vehicles, both in domestic and business use, could relieve themselves from the mental strain and apprehension incident to accidents on the streets and highways which the tremendous increase in that type of transportation has brought about. The fact that such insurance is still within the reach of the average operator is due to the wide distribution of the costs and burden to the shoulders of the millions of policyholders, many of whom never have an accident or occasion to call upon the general pool of funds which is provided from the premiums of the whole

as the only source for payment. Necessarily, the rates must depend upon the volume of claims and the amounts paid or recovered in lawsuits against the insured or their insurers. This is easily seen by looking at the business from a nation-wide standpoint. However, it is no doubt true that these rates are higher proportionately in some areas where the number of accidents and the amount paid out, for one reason or another, are larger than in others. Where this result flows from lax, inefficient, or absence of, traffic control by those upon whom the duty rests, it is a risk which the insurer must take and, to maintain its solvency, will require increasingly higher rates until proper regulation is maintained. The same is true with respect to the failure to safeguard the highways by excluding therefrom all types of livestock, and the lack of control of vehicles which, because of age, mechanical condition or the lack of insurance, constitute a menace to life and property. Reasonable control, it would seem, is much to be preferred to the death of a single human being without it.

However, when a state seeks to restrict and discriminate against any class of persons, whether corporations or individuals, in their freedom to make contracts to minimize their liability against unreasonable claims of persons who, in the making of such contracts, are not parties thereto and only acquire rights flowing therefrom because of the fault of the person who provides himself with such protection, that action assumes an arbitrary character, which not only seriously impairs the freedom of contract but has the effect of denying equal protection of the laws. In Robertson v. People of the State of California, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366, also decided after the passage of the McCarran Act, the court was concerned with the question of whether the laws of that state requiring that a license be obtained by anyone to sell insurance of a foreign company in California and imposing certain restrictions as to reserves, etc., was an unwarranted interference with interstate commerce and discriminatory against a foreign corporation. After declaring that the state had the right to exclude a foreign corporation altogether, it was found that there was no discrimination. The court pointed out the evils against which the law of the state was directed, such as fraud, possible insufficient financial responsibility, and other impositions which might be visited upon its citizens but for these reasonable safeguards. No such conditions are discernible in the Louisiana statutes, but these seem to be an arbitrary exposure of foreign insurance corporations to all of the dangers of bias and prejudice of which human nature is capable in determining both liability and the amount of recovery. This is brought about by permitting a third party, because he is citizen of the State of Louisiana, who originally had no concern with the contract made in good faith and for substantial reasons, to haul the insurers into court before a jury of laymen to decide the issues, all in defiance of the agreement between the parties to the contract that this should not be done. These measures permit claimants, by the accident of diverse citizenship, to avoid the courts of their own state, whose judges are better qualified to determine all their rights, largely because they are not susceptible to arguments intended to arouse bias and prejudice, but who have the power to disregard the verdicts of juries and to decide both issues of fact and law. The result is an unquestionable discrimination against a nonresident insurer, as compared with those companies created by the law of the state, the latter having the benefit of the experienced judgment of the court on issues of fact and the determination of fair compensable recoveries. It cannot be overlooked that this court in this type of case interprets and applies exclusively the state law, and it is only the incident of the constitutional right to a jury, when timely asked, than has caused the bringing of so many suits of this nature in the federal courts of Louisiana.

It may be argued that this legislation was intended to prevent delays in the determination of these cases, in that nonresident insurance companies might not be readily available after the question of liability and the amount of recovery had

been determined against the insured. Answering any such contentions, in reverse order, it is obvious that if the insurance company is accessible for the direct action, no reason can be seen why it would not be for the collection of a judgment against its insured. On the first point of delay or extended litigation, there seems to be no reason why the state could not control this by providing that notice of the suit should be formally served upon the insurer and the right accorded him to join in the defense without being exposed to the knowledge of the jury, with the alternative that it be denied the right to further litigate those issues except upon grounds that would require relief if sued in a direct action.

█ The value of the right of the insurer not to be exposed to the knowledge of a jury in such cases is so highly regarded in some of the states that it is reversible error to permit the fact that there is insurance to be made known at the trial. How can it be said, then, that the requirement of prior liquidation of any claim against the insured is not a valuable property right when the contract is lawfully made between the parties beyond the jurisdiction of this state, or that its compulsory giving-up without hearing does not constitute an arbitrary deprivation thereof without due process, contrary to the Fourteenth Amendment of the Federal Constitution?

█ The character of the attempt in this case is so far reaching and unreasonable that it is believed it can make no difference whether the contract of insurance was made before or since the state legislation was enacted. Its enforcement would work an unconstitutional deprivation of property and denial of due process in either case. Granting that the state may exclude all foreign insurance companies from its borders, as a practical matter it is believed that any such course would produce its own solution. If any large proportion of the foreign insurance companies withdrew or were excluded, it would probably require only a short time for public demand to force reconsideration by the Legislature. The attempt to compel the giving up of the

constitutional protection against deprivation of property without due process is as untenable, it is thought, as the requirement that a citizen of another state surrender his right of resort to the federal courts, and, therefore, equally unenforceable. The former is an immunity which cannot be taken away, while the latter accords a choice of forum which the state has no power to deny, whether waived or not. Home Insurance Co. of New York v. Morse, 20 Wall. 445, 87 U.S. 445, 22 L.Ed. 365; Barron v. Burnside, 121 U.S. 186, 7 S.Ct. 931, 30 L.Ed. 915; Southern Pacific Co. v. Denton, 146 U.S. 202, 13 S.Ct. 44, 36 L.Ed. 942. See, also, Neirbo Co. v. Bethlehem Shipbuilding Corporation, 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167. In addition, see Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178, and as directly in point, Ritterbusch v. Sexmith, 256 Wis. 507, 41 N.W.2d 611, 16 A.L.R.2d 873.

While preparing the opinion in the present case, this court tried another in which the circumstances were as follows: On October 10, 1950, the four plaintiffs were riding as passengers or guests in a 1948 Plymouth four-door sedan. The driver was the husband of one of the plaintiffs and the son-in-law of another; the other two were sisters, one the wife of the owner of the automobile who held a policy of insurance with that defendant, which was also a foreign corporation. The policy contained the usual omnibus clause covering the driver of the automobile which had been loaned to the party of five for use on a trip from Lafayette, Louisiana, to New Orleans, Louisiana. While traveling in the early morning hours, between 5 and 5:30 A.M., at a speed estimated by the witnesses, all occupants of the car, at between 40 and 50 miles per hour, the left front end of the car struck what was called a "separator," made of concrete, some 26" high, and on the top of which there was a warning sign calling attention to its presence, and which could easily have been seen by the driver. The latter claimed he did not see it in time to swerve to the right and avoid hitting it. There

were two lanes of traffic across the bridge or trestle, each wide enough for two vehicles to travel abreast, thus making it what is commonly called a four-lane highway. All occupants of the car were injured, some more seriously than others. All, except the driver, who was, as stated, the husband of one of them, joined in a single complaint. The alleged negligence of this driver was the sole basis of liability of the defendant. That action, as in the present case, was brought directly against the insurer of the owner of the car.

The occupants of the automobile, including the alleged negligent driver, were the only available witnesses to all of the pertinent facts, including weather conditions, speed of the car, condition of the lights, keeping of a lookout by the driver, and the portion of the four-lane highway on which he was driving. All of them stated he was in the middle of the highway and ran head-on into the concrete obstruction. The driver, in corroborating them as to his position on the highway, swore he did not see the separator of the two lanes of traffic until he was so close that it could not be missed, although he attempted to pull to the right and put on his brakes as soon as he saw it. They all swore at the trial that nothing happened to cause the automobile to swerve to the left and to get out of control and run into the separator. This was done notwithstanding that two days after the accident, they had signed statements that a tire had gone flat. If a tire did go flat and it was on the left front wheel, which was the only one flat after the accident, this was calculated to cause the automobile at the speed they said it was traveling, to swerve to the left and to prevent the driver from steering it away from the obstruction. If that was what actually happened and the driver was in his proper position on the left side of the eastbound lane, or far enough over to avoid striking the obstruction, it would have absolved him of negligence, in the absence of other proof to support it. On being confronted with their signed statements, the witnesses denied any recollection of having made the statements. However, on cross-examination, the driver, after being admonished by the Court to tell the truth, admitted the correctness of his statement that the tire had gone flat, although he had sworn on direct examination for the plaintiffs that nothing of the kind happened. On the Court's denying plaintiffs the right to call this driver on cross-examination, he was made their witness. He became, therefore, the principal witness to establish his own negligence, in not seeing the obstruction until it was too late, notwithstanding he had good lights and was perfectly familiar with the highway and the location of this trestle or bridge which he was approaching. He could give no explanation or excuse for his driving in the center of the road or his failure to see the obstruction in time to avoid it.

Of course, the Court charged the jury that they should take into consideration the relationship of the parties, their personal interests in recovering damages, and their conflicting statements in determining their credibility and the weight of their evidence, particularly with reference to the flat tire.

It requires only the statement of these circumstances to disclose the great handicap under which the defendant labored in getting before the jury the facts. The Court, of course, had to tell the jury that the negligence of the driver could not be imputed to the plaintiffs. Verdicts totalling $15,000 were returned. If the plaintiffs had been compelled to sue the driver alone, or even as a codefendant of the insurance company, it is doubtful whether the action would ever have been brought. If it had been brought directly against the driver alone or jointly against him and the insurer, of course, the judgment both as to liability and amount would have had to go first against him and would have become a lien against his property even beyond the amount of the policy, which was limited to $10,000 for one person and $20,000 for two or more claimants. He would thereby have become a real defendant, in which case self-interest probably would have induced him to tell the truth at all times to protect his own financial interests. No such inducement was or could have had any influence when the in-

surer alone was made a defendant and the prescription of one year under the Louisiana law had run in the driver's favor at the time the case was tried.

This case is cited as a concrete example of the unfairness and injustice of permitting a direct action against the insurer alone and a clear demonstration that to permit it as to contracts lawful where made, would arbitrarily deprive the insurer of a valuable right or property without due process.

The motion to dismiss should be sustained.

Proper decree may be presented.