MARYLAND CASUALTY COMPANY, Plaintiff and Appellee, *v.* SAN JUAN RACING ASSOCIATION, INC., Defendant and Appellant.

No. 12486. Decided September 22, 1961.

*Córdova & González* and *Jorge L. Córdova, Jr.,* for appellant. *Géigel & Silva, Jaime A. García Blanco,* and *Hernán G. Pesquera* for appellee.

Division composed of Mr. Justice Hernández Matos, as Chief Judge of Division, and Mr. Justice Blanco Lugo and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The former Racing Commission required the San Juan Racing Association, Inc. to give bond for the sum of $50,000 to secure the construction within a certain period of time of the race track to be known as El Comandante. The policy was issued in the United States, in the City of Pittsburgh, but was countersigned in Puerto Rico by the insurance company's local agent. The San Juan agency had refused to issue the policy when the application was made here in

Puerto Rico. When the policy was signed in Pittsburgh, the defendant paid the sum of $2,500 covering the first year's premium in accordance with the prevailing rates in the State of Pennsylvania, but it did not tender any payment in the next two years. This action was brought to collect the premiums corresponding to those two years. The defendant's defense is predicated on the theory that the rates prevailing in Puerto Rico [1] and not those of the State of Pennsylvania are applicable to the contract. It maintains that if it were so held, the plaintiff is bound to refund the excess paid in the initial payment and to that effect it counterclaimed. The trial court sustained the complaint and held that the bond contract entered into is governed by the laws of Pennsylvania.

Is the trial court's conclusion correct in the sense that the bond contract object of this action is governed by the laws of the state of the Union?

■ There is considerable diversity of criteria among the authorities as to the law applicable when different stages of a transaction are carried out in different jurisdictions. *Ponce v. F. Badrena e Hijos, Inc.*, 74 P.R.R. 210 (1952). The conflict is even greater in the case of insurance contracts. See *Zogg v. Penn Mutual Life Insurance Company*, 276 F.2d 861 (2d Cir. 1960).

In the instant case, the application was filed in Pittsburgh. The policy was issued and the first year's premium was paid in that city. The contract was countersigned [2] in Puerto Rico by the insurance company's authorized agent in this Island. The insured had established local offices; the insurance company was authorized to do business in the Island, and the Racing Commission, the entity in whose favor the

---

[1] Apparently, the prevailing rates in Puerto Rico are much lower than those in Pennsylvania.

[2] According to the Dictionary of the Royal Academy, to countersign means to authorize a writing or other document by means of the signature of a qualified person.

bond was issued, was an agency of the Commonwealth. The race track would be constructed in Puerto Rico.

For the decision of similar situations, there are authorities which apply the law of the state where the policy was issued and the initial premium paid. *Gray* v. *Metropolitan Life Ins. Co.*, 150 S.W.2d 563 (Mo. 1941); *Hinchey* v. *National Surety Company*, 111 A.2d 827 (N.H. 1955); 12 Appleman, Ins. L.&P. § 7079 (1943 ed.) Other authorities favor the law of the state where the last act necessary to the validity of the policy was executed. *Martin* v. *Zurich General Accident & Liability Ins. Co.*, 13 F. Supp. 162 (D.C.R.I. 1935); *New York Life Ins. Co.* v. *Chapman*, 132 F.2d 688 (8th Cir. 1943); 12 Appleman, Ins. L.&P. § 7080 (1943 ed.).

Before proceeding further, it is necessary to consider first of all the fact that the contract was countersigned in Puerto Rico. What was the reason for so doing and what was its effect? Having examined the statutes in force at the time the contract was executed, we find that § 21 of Act No. 66 of July 16, 1921 (26 L.P.R.A. § 911) provides that "[n]o foreign insurance company shall insure residents of Puerto Rico or property located in Puerto Rico except through an authorized agent of said company residing in Puerto Rico, *who shall countersign the policies...*" (Italics ours.) Therefore, by provision of law the countersignature was necessary to the validity of the insurance contract in this jurisdiction.[3]

Did the Legislative Assembly have power to require that every policy be countersigned by the agent of the issuing company in Puerto Rico with the evident purpose that the last act necessary to its validity be executed in this jurisdiction? It seems pertinent to point out that it has been held that an insurance contract is deemed completed, for the

---

[3] The Insurance Code in force preserved this provision. Insurance Code, § 3.290, Act No. 77 of June 19, 1957 (26 L.P.R.A. § 329), but took a step forward in providing that any condition in a contract requiring that it shall be governed by the laws of another jurisdiction shall not be valid. *Id.*, § 11.190 (26 L.P.R.A. § 1119).

542

purpose of the controlling law, in the place of countersignature. *Lumbermans Mut. Casualty Co.* v. *Blake*, 47 A.2d 874 (N.H. 1946); *New York Life Ins. Co.* v. *Bonasso*, 2 S.E.2d 260 (W. Va. 1939); 12 Appleman, Insurance Law and Practice § 7088 (1943 ed.). Having established the foregoing, let us consider next the validity of the above-transcribed legal provision.

In *Osborn* v. *Ozlin*, 310 U.S. 53 (1940), the United States Supreme Court considered a provision similar to that under consideration and concluded that it did not contravene any constitutional provision. It was held that the laws of one state may have repercussions beyond its borders so long as it is not that domain which the Constitution forbids. And provisions such as ours do not transgress that limitation. The insurance business has always been deemed as vested with a public interest which warrants intervention by the State in its regulation. The following cases have upheld the constitutional validity of different forms of regulation of the insurance business by the State against attacks to the effect that they contravened the due process clause of the Fourteenth Amendment. *Hooper* v. *California*, 155 U.S. 648 (1895); *Orient Insurance Company* v. *Daggs*, 172 U.S. 557 (1869); *Nutting* v. *Massachusetts*, 183 U.S. 553 (1902); *Carroll* v. *Greenwich Insurance Co.*, 199 U.S. 401 (1905); *Northwestern Life Ins. Co.* v. *Riggs*, 203 U.S. 243 (1906); *Whitfield* v. *Aetna Life Ins. Co.*, 205 U.S. 489 (1907); *German Alliance* v. *Hale*, 219 U.S. 307 (1911); *German Alliance Ins. Co.* v. *Lewis*, 233 U.S. 389 (1914); *Mountain Timber Co.* v. *Washington*, 243 U.S. 219 (1917); *La Tourette* v. *McMaster*, 248 U.S. 465 (1919); *National Ins. Co.* v. *Wanberg*, 260 U.S. 71 (1922); *Merchants Liability Co.* v. *Smart*, 267 U.S. 126 (1925); *O'Gorman & Young* v. *Hartford Ins. Co.*, 282 U.S. 251 (1931); *Hardware Insurance Co.* v. *Glidden Co.*, 284 U.S. 151 (1931); *Life & Casualty Ins. Co.* v. *McCray*, 291 U.S.

566 (1934); *Hoopeston Co.* v. *Cullen,* 318 U.S. 313 (1943); *State Farm Ins. Co.* v. *Duel,* 324 U.S. 154 (1945); *Robertson* v. *California,* 328 U.S. 440 (1946); *Daniel* v. *Family Ins. Co.,* 336 U.S. 220 (1949).

In *Hoopeston Co.* v. *Cullen,* 318 U.S. 313 (1943), there was specifically considered a provision similar to that of our law requiring that every insurance company should have an authorized agent to countersign its policies. In considering the question and passing upon its validity, the Supreme Court said the following:

"... The provisions requiring an office in the state and countersignature of the contracts by an agent in the state are no more stringent than those approved in *La Tourette* v. *McMaster,* 248 U.S. 465 [1919]."

Having established the validity of the provision requiring countersignature, we would be in a position to adopt the rule enunciated in the above-cited cases which hold that the controlling law is the law of the place where the last act necessary to the validity of the contract was executed.

But the fact is that, independently of the technical question which we have just considered, the *Hoopeston* case rejected conceptualistic theories of the "place of contracting" in the insurance activities as a limitation of the State's power to protect its citizens, emphasizing that the act of issuing a policy is but an intermediate step and that the future consequences of the contract are the real object of the transaction. We have already seen that in the case at bar the acts performed in Pittsburgh were preliminary and ephemeral. When application for the insurance was made in Pittsburgh, the defendant's representative was living in Puerto Rico, the corporation was domestic, the complete contract sought to be secured would be executed here; the beneficiary of the insurance was one of our government agencies. The fact that the first year's premium was paid in Pennsylvania is of no

significance. *Zogg* v. *Penn Mutual Life Insurance Company, supra.* Note, 27 Brooklyn L. Rev. 144 (1960).

■ These circumstances warrant the application of the laws of Puerto Rico to the contract, as was done by the United States Supreme Court in applying the laws of New York to the contract involved in the *Hoopeston* case. This doctrine is known as the "point of contact," according to which the law of the state having more contact with the object insured is controlling, the presumption being that that is the state which has more interest in any question which may arise in connection with the contract. *Travelers Health Assn.* v. *Virginia,* 339 U.S. 643 (1950); *Hoopeston Co.* v. *Cullen, supra; Zogg* v. *Penn Mutual Life Insurance Company, supra; Kievit* v. *Loyal Protective Life Ins. Co.,* 170 A.2d 22 (N.J. 1961); *Auten* v. *Auten,* 124 N.E.2d 99 (N.Y. 1954). Note, 74 Harv. L. Rev. 357, 378 (1960).

■ It is actually the tendency of the courts to adopt this doctrine in cases involving insurance contracts. It is warranted by the State's interest to protect its citizens, since the insured is generally bound to accept the company's conditions in the insurance contract. He is in no position to demand better terms. Either he accepts them or has no policy. Hence, this type of contracts is labelled contracts of "adhesion." Castán explains it as follows:

"The modern doctrine, as of Saleilles, has labelled adhesion contracts those contracts in which the contents, *i.e.,* the regulatory conditions, are the doings of only one party, so that the other contracting party contributes nothing to the formation of the contractual contents, thereby substituting the usual bilateral determination of the contents of the bond by the mere act of accepting or adhering to the unilaterally predetermined plan.

" 'This type of contracts is linked to the economic phenomenon of the privileged position which, for different reasons (for example in order to exercise a monopoly of law or of fact), one of the parties has with respect to the other. In this sense

Messineo defines the contract of adhesion as a contract in which the *economically strongest party* imposes specific conditions or the full scheme of the contract, to his advantage and in detriment to the other contracting party who, being *economically weaker,* has no freedom of choice other than to accept those conditions or scheme or refuse to enter into the contract.' II Manuale 340 (6th ed.)" 3 Castán, *Derecho Civil Español* 332 (1954 ed.). (Italics ours.)

In the United States they are known as "adhesion contracts" [4] and they have been defined thus: "agreements in which one party's participation consists in mere 'adherence,' unwilling and often unknowing, to a document drafted unilaterally and insisted upon what is usually a powerful enterprise." Ehrenzweig, *Adhesion Contracts,* 53 Colum. L. Rev. 1072, 1075 (1953). See also, Ehrenzweig, *Contracts in the Conflict of Laws,* 59 Colum. L. Rev. 973 (1959).

Regarding the prevailing tendencies as to the law applicable to insurance contracts, in *Zogg, supra,* it was stated as follows:

" . . . Defendant's position is that formation of the contract in Massachusetts requires a reference to the law of that state as the *locus contractus.* We need not consider the extent to which this choice-of-law rule may today be considered as generally applicable in the contract field. It need only be noted that in the area of adhesion contracts, particularly in the insurance field, any generalization as to a majority, or even preferable, view is apt to constitute a misleading oversimplification. Cf. Ehrenzweig, Contracts in the Conflict of Laws, 59 Col. L. Rev. 973, 986, 1014 (1959). Decisions involving the applicability of the insurance laws of the several states to transactions including foreign elements appear irreconcilable in terms of any uniform conflict-of-laws theory. If any trend is discernible in these cases, it is that of a forum to apply its own

---

[4] The term "adhesion contracts," used in Spain and in the United States, has a common origin in the work of Raymond Saleilles "De la Declaration de Volonté" (1901) where the phrase "contract d'adhésion" was coined. See Ehrenzweig, *Adhesion Contracts,* 53 Colum. L. Rev. 1072 (1953), footnote 17.

law to adhesion contracts of insurance entered into by its residents. See Lenhoff, Conflict Avoidance in Insurance, 21 Law & Contemp. Prob. 549, 551-552 (1956)."

█ It is clear, therefore, that we ought to adopt in this jurisdiction the theory which supports the applicability of the laws of the state which has more contact, closer relation with the contract, because of the latter's enormous interest in protecting the interest of its citizens. The reasonableness of the theory which we now adopt may be shown better if we consider the facts of this case. If we apply, as did the trial judge, the law of the state where the bond was signed and the initial premium paid to the contract object of this action, we would be helping the insurance companies in their attempt to prevent that the rates approved for those contracts by the Insurance Commissioner be applied to contracts relating to Puerto Rico. The insurance companies would refuse, in view of their advantageous position, to issue policies in Puerto Rico, as was done in the instant case, and the interested party would have to look to another state to obtain the policy which was denied to him in Puerto Rico and to pay the prevailing rates in that state. The power to regulate the rates applicable in Puerto Rico would thus become illusory. The entire structure created by the Legislative Assembly in the Insurance Code for the purpose of promoting the welfare by regulating insurance rates to the end that they shall not be excessive, inadequate, or unfairly discriminatory, would be destroyed. Insurance Code, § 12.010 (26 L.P.R.A. § 1201). This, no doubt, would have adverse effects in our economy.

The trial court therefore erred in concluding that the laws of Pennsylvania apply to the contract object of this suit. The judgment appealed from will be reversed and the case remanded for further proceedings consistent with the principles enunciated in this opinion.